**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**KEVIN WILDER** | **CASE NO.: 6:20-cv-01383**

**VERSUS** | **JUDGE ROBERT R. SUMMERHAYS**

**SCOTT MORGAN, ET AL.** | **MAGISTRATE JUDGE CAROL B. WHITEHURST**

# MEMORANDUM RULING

The present matter before the Court is a Motion for Summary Judgment [ECF No. 77] filed by former Chief of Police Scott Morgan ("Morgan") and Lafayette City-Parish Consolidated Government ("LCG"). Plaintiff Kevin Wilder asserts claims under 42 U.S.C. § 1983 along with Louisiana state law claims. Morgan and LCG (collectively, "Defendants") seek summary judgment on all remaining claims which include (1) claims against Morgan; (2) claims against LCG; and (3) state law claims against LCG. Because there are no genuine issues of material fact, the Court GRANTS summary judgment in favor of Defendants.

## I. BACKGROUND

On October 26, 2019, Plaintiff Kevin Wilder drove his truck into a telephone pole on St. Julien Avenue in Lafayette, Louisiana.[1] Officers Dylan Smith and Trent Mouton with the Lafayette Police Department ("LPD") responded to the scene of the accident and suspected that Wilder had been driving under the influence.[2] Wilder was seated on the curb until the officers were ready to conduct an Operating While Intoxicated ("OWI") investigation.[3]

[1] ECF No. 77-2, p. 2.
[2] *Id.*
[3] ECF No. 77-4, Exhibit A to Defendants' Motion for Summary Judgment, Attachment 1, Video.

Officer Smith, an Alcohol Traffic Action Campaign Unit ("ATAC") Officer for the LPD, arrived on the scene to conduct a Standardized Field Sobriety Test ("SFST") on Wilder.[4] After advising Wilder of his *Miranda* rights, Officer Smith directed Wilder from the curb to the front of the LPD vehicle.[5] Dashboard and body camera footage show that rather than stopping at the front of the vehicle, Wilder continued walking towards the passenger side.[6] Officer Smith took hold of Wilder's arm and directed him back to the front of the car.[7] At this point, Officer Mouton joined to assist in the test.[8]

As Wilder stood at the front of the vehicle, Officer Smith asked about the cellphone in Wilder's hand.[9] When Wilder failed to respond or show Smith his phone, Smith reached for Wilder's hands.[10] Wilder immediately pulled his hand away, clutched the phone to his chest, and appeared to twist his body away from Smith.[11] Officers then attempted to restrain Wilder and place him in handcuffs. While still standing, Wilder resisted being placed in handcuffs and appeared to grip the "push bar" of the police unit with his right hand to avoid being handcuffed.[12] The officers reacted to Wilder's actions by performing an empty-handed "takedown maneuver," bringing Wilder to the ground.[13] This maneuver consisted of Officer Smith attempting to pin Wilder's arm behind his back while Officer Mouton executed a leg sweep, bringing both Wilder and Officer Smith stumbling forward to the ground.[14] Wilder's movements appeared to cause the officers to lose balance as they are attempting to take him to the ground, and Wilder and the officers landed

4 ECF No. 77-10 at 10-11.
5 ECF No. 77-4, Exhibit A, Attachment 1.
6 *Id.*
7 *Id.*
8 *Id.*; ECF No. 77-7 at 16-17.
9 ECF No. 77-4, Exhibit A, Attachment 1.
10 *Id.*
11 *Id.*
12 *Id.*
13 *Id*; ECF No. 77-7 at 67; WCF No. 77-6, p. 10 (showing the takedown technique used).
14 ECF No. 77-4, Exhibit A, Attachment 1.

awkwardly, which was likely the cause of Wilder's head striking the ground.[15] Officer Mouton then placed his knee on Wilder's upper back and neck while Officer Smith handcuffed Wilder.[16] The officers had to physically maneuver Wilder's arms into position for the handcuffs.[17] This sequence of events–from takedown to handcuffing–took approximately 10 seconds on the bodycam footage.[18] Wilder sustained an injury near his left eye from hitting the ground during takedown.[19] Once handcuffed, Wilder was adjusted to an upright seated position and medically examined.[20]

Wilder filed his original complaint on October 26, 2020, asserting claims against multiple unidentified officers, several individual officers, Lafayette City-Parish Consolidated Government ("LCG"), and former Chief Morgan.[21] The Court later denied a motion to dismiss and granted plaintiff leave to file his First Amended Complaint.[22]

In response to the First Amended Complaint, all defendants filed motions to dismiss, arguing that the amended pleading failed to state a viable *Monell* claim.[23] In March of 2022, the Court granted Former Chief Morgan's motion to dismiss as to claims against him in his official capacity.[24] However, this Court denied the motion to dismiss with respect to Wilder's *Monell* claims against LCG and ordered Wilder to file a Second Amended Complaint.[25]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 03:07-03:44.
[20] ECF No. 77-2, p. 3.
[21] ECF No. 1.
[22] ECF No. 9-4, Denying Motion to Dismiss for Failure to State a Claim, Motion for More Definite Statement; ECF 9-8 granting Motion to Amend/Correct Complaint.
[23] ECF No 18-1.
[24] ECF No. 32
[25] *Id.*

Wilder's Second Amended Complaint was followed by the Defendants' renewed motion to dismiss.[26] The Court dismissed the claims asserted against Chief Morgan and Officer Shanahan in their official capacities along with the § 1983 bystander claims against Officers Smith, Mouton, and Baudoin.[27] The Court declined to dismiss Wilder's *Monell* claims against LCG.[28] The Court also retained jurisdiction over Wilder's remaining state claims.[29] The only remaining Counts include Counts 2 and 3 (federal *Monell* claims against LCG) and Count 6 (state law claims against LCG). Defendants subsequently filed the present Motion for Summary Judgment.[30]

## II.
## SUMMARY JUDGMENT STANDARD

A court shall grant summary judgment if there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law.[31] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[32] The Fifth Circuit stated:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.[33]

A genuine dispute requires that the movant cite "to particular parts of materials in the record," or demonstrate that "the materials cited do not establish the absence or presence

[26] ECF No. 35, Second Amended Complaint; ECF 41-1, Motion to Dismiss for Failure to State a Claim.
[27] ECF No. 55, Ruling on Report and Recommendation.
[28] *Id.*
[29] *Id.*
[30] ECF No. 77-2.
[31] Fed. R. Civ. P. 56(a).
[32] *Quality Infusion Care, Inc v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[33] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994).

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[34] Mere allegations of an existing dispute will not suffice.[35]

## III.
## Discussion

### A. Federal Claims Against LCG.

LCG first challenges Wilder's *Monell* claims.[36] A municipality cannot be held liable under § 1983 based on vicarious liability solely because its employee participates in unconstitutional actions. Instead, under *Monell*, a municipality may be held liable for unconstitutional conduct based (1) an official policy or custom, (2) promulgated by a municipal policymaker, and was the (3) moving force for the violation of a constitutional right.[37]

#### 1. Was There a Constitutional Violation?

Under these requirements, Wilder must first prove that he suffered a violation of his constitutional rights. He alleges that the responding officers' "takedown" maneuver that resulted in Wilder's head striking the ground amounted to excessive force in violation of the Fourth Amendment. To prove a Fourth Amendment excessive force claim, Wilder must prove that he suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable."[38] In assessing whether a plaintiff can prove these elements, courts consider the factors articulated by the Supreme Court in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting

---

[34] Fed. R. Civ. P. 56(c)(1).
[35] *Id.*
[36] *Monell*, 436 U.S. 658.
[37] *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).
[38] *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (quoting *Windham v. Harris County*, 875 F.3d 229, 242 (5th Cir. 2017) (internal quotation marks omitted)).

to evade arrest by flight."[39] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[40] Courts must "consider 'not only the need for force, but also the relationship between the need and the amount of force used.' "[41] When confronting "an uncooperative arrestee, officers properly use 'measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance.' "[42] But "[a]n officer cannot use force against a citizen who has 'committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command.' "[43]

Application of the *Graham* factors is fact-intensive and turns on the "circumstances of each particular case."[44] However, "a court may rely on video evidence to resolve any claimed genuine disputes of material fact and rule on summary judgment."[45] Here, the summary judgment record includes multiple body-cam and dash-cam recordings and, as in *Hodge v. Engleman*, these video recordings cover the entire interaction (as far as the takedown maneuver) between Wilder and the responding officers and are "sufficiently clear and whole that there are no genuine disputes of material fact."[46]

Wilder argues that, at most, he was only passively resisting when he pulled his arm away from the responding officer who attempted to take his cellphone. Citing *Trammel v. Fruge*, Wilder argues that mere "passive resistance" does not justify the use of force.[47] According to Wilder,

[39] 490 U.S. 386, 395 (1989).
[40] *Id.* at 396 (citation omitted).
[41] *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020)).
[42] *Id.* (quoting *Joseph*, 981 F.3d at 332–33).
[43] *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (quoting *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012)).
[44] *Id.*
[45] *Hodge v. Engleman*, 90 F.4th 840, 846 (5th Cir. 2024).
[46] *Id.*
[47] 868 F.3d 332, 341 (5th Cir. 2017).

"Smith and Mouton [the responding officers] used excessive force in violation of Plaintiff's Fourth Amendment rights when they—without any negotiation or de-escalation even though they knew Plaintiff was intoxicated/impaired and should have known that Plaintiff would need more time to comply—immediately tackled Plaintiff down to the ground simply because Plaintiff pulled his arm a few inches back from Smith's grasp."[48]

Based on the video recordings, the take-down maneuver by the responding officers was undisputedly a use of force. The video, however, contradicts Wilder's assertion that this use of force occurred in the context of mere "passive resistance." As the responding officers prepared to administer an OWI test, Officer Smith asked about the cellphone in Wilder's hand.[49] When Wilder failed to respond or show Smith his phone, Smith reached for the cellphone in Wilder's left hand.[50] Wilder immediately pulled his hand away, clutched the phone to his chest, and appeared to twist his body away from Smith.[51] Officers then attempted to restrain Wilder and place him in handcuffs. While still standing, Wilder appeared to grip the "push bar" of the police unit with his right hand to avoid being handcuffed.[52] The officers reacted to Wilder's actions by performing an empty-handed "takedown maneuver," bringing Wilder to the ground.[53] This maneuver consisted of Officer Smith attempting to pin Wilder's arm behind his back while Officer Mouton executed a leg sweep. Wilder then appears to lunge forward, bringing both Wilder and Officer Smith stumbling forward to the ground.[54] Based on the video, Wilder's movements were an active attempt to resist handcuffing and the takedown maneuver, and his evasive movements appeared to cause the officers to lose balance as they attempted to take him to the ground. As a result, Wilder and the

[48] ECF No. 83 at 17.
[49] ECF No. 77-4, Exhibit A, Attachment 1.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id*; [Doc. 77-7, p. 67 & Doc. 77-6, p. 10 (showing the takedown technique used).
[54] ECF No. 77-4, Exhibit A, Attachment 1.

officers landed awkwardly on the ground, which is likely the cause of Wilder's head striking the ground.[55] Even after the officers got Wilder to the ground, they struggled to get handcuffs on him.

Turning to the *Graham* factors, the responding officers had reasonable suspicion that Wilder was intoxicated when he drove his truck into a utility pole. The Fifth Circuit has held that OWI is a serious crime for purposes of the *Graham* factors.[56] The video recordings of the arrest show that Wilder was not following the responding officers' commands and resisted turning over his cellphone and the officers' attempts to exercise control over him. As far as danger to the officers, while the cellphone could have been used as a weapon and Wilder was not cooperating with the officers, it is less clear based on the video whether Wilder posed a danger to the officers. However, the open-handed takedown maneuver used by the officers was a proportionate response to Wilder's actions, and a reasonable effort by the officers to regain control over Wilder. Unlike the cases cited by Wilder, the officers did not strike or tase Wilder, nor did they employ a maneuver designed to violently slam him to the ground. Once Wilder was handcuffed, the officers' use of force ceased and they rendered medical aid.

The cases cited by Wilder are distinguishable from the present case. In *Trammel*, the arresting officer "executed a knee strike on Trammel's right thigh" and placed him in a headlock[57] The officers then tackled Trammel "and landed on top of his body so that he landed face first on the pavement."[58] After Trammel was taken to the ground, the officers "administered knee strikes to Trammel's arms, thighs, and ribs" in order to place handcuffs on him.[59] In contrast, in the present case, the arresting officers did not administer knee strikes or violently tackle Wilder. Wilder fell

[55] *Id.*
[56] *Cooper v. Brown*, 844 F.3d 517, 523 (5th Cir. 2016).
[57] 868 F.3d at 336.
[58] *Id.*
[59] *Id.*

awkwardly and struck his head on the ground, in part, because of his evasive movements that threw him and the officers off balance.

In *Goodson v. City of Corpus Christi*,[60] the plaintiff pulled his arm away from the arresting officer. The first arresting officer "hit his body" and second officer "grabbed his legs" and violently tackled him to the ground.[61] The force of the tackle "broke [the plaintiff's] shoulder," and the plaintiff testified "that he knew his arm was broken immediately because he heard it crack when he hit the ground."[62] While subduing the plaintiff, the officers yelled "[w]e'll teach you to run from us, you son of a bitch."[63] Unlike the present case, there is no mention in *Goodson* of video evidence showing the encounter between the plaintiff and the arresting officers. The court concluded that there were triable issues on the plaintiff's excessive force claim. However, the court there expressly tied its conclusion on excessive force to its conclusion that the officers lacked reasonable suspicion to stop and detain the plaintiff.[64] In the present case, the arresting officers did not employ the force employed by the officers in *Goodson*. Unlike *Goodson*, there is no evidence in the summary judgment record that the arresting officers intended to injure Wilder to "teach him" a lesson. Finally, unlike *Goodson*, there is no dispute that the arresting officers in the present case had reasonable suspicion that Wilder was driving while intoxicated.

In *Hanks v. Rogers*,[65] the plaintiff faced away from the arresting officer and "surrendered [his empty hands] behind his back" for handcuffing. The officer "rushed towards [the plaintiff] and administered a blow to [the plaintiff's] upper back or neck"—referred to as a "half spear"—

---

[60] 202 F.3d 730, 733-734 (5th Cir. 2000).
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.* at 740 ("Goodson has produced sufficient summary judgment evidence to suggest that he suffered a broken shoulder as a result of being tackled by Gaines and Perez, who lacked reasonable suspicion to detain or frisk him and from whom he was not fleeing. A fact issue therefore exists as to the objective reasonableness of the force used.")
[65] 853 F.3d 738, 742–43 (5th Cir. 2017).

which "forced [the plaintiff's] upper body onto the trunk of his vehicle."[66] Again, the level of force at issue in the present case was less than in *Hanks* and, unlike the plaintiff in *Hanks*, Wilder was actively resisting and failing to comply with the arresting officers' commands.

The force at issue in *Ramirez v. Martinez*[67] and *Doss v. Helpenstell*[68] also differed from the force at issue in the present case. In *Ramirez*, the plaintiff alleged that he was tased at least twice, and that the last application of the taser occurred when he was subdued and restrained by handcuffs.[69] Unlike the present case, the court concluded that the video of the incident was "too uncertain to discount [the plaintiff's] version of the events."[70] In *Doss*, the plaintiff alleged that the arresting officer "brutally and without provocation punched [him] several times in the head and struck him with his pistol."[71] He further alleged that the officer's actions "knocked [him] unconscious, at which point [the officer] 'violently threw [him] to the concrete' outside the car and handcuffed him."[72] The parties disputed whether the plaintiff displayed a handgun prior to the use of force.[73] Unlike the present case, there was no video evidence cited to contradict the plaintiff's version of the arrest.

In sum, considering the *Graham* factors as a whole in light of the video evidence, the Court concludes that Wilder has not created a triable issue with respect to his excessive force claim. As a result, Wilder cannot prove that he suffered a violation of his constitutional rights, which is a required element of his *Monell* claim. His *Monell* claim against LCG must, therefore, be dismissed.

---

66 *Id.*
67 716 F.3d 369, 379 (5th Cir. 2013).
68 626 F. App'x 453, 455 (5th Cir. 2015).
69 716 F.3d at 379.
70 *Id.*
71 626 F. App'x at 455.
72 *Id.*
73 *Id.*

### 2. Was a Municipal Policy the Moving Force Behind the Violation?

Even if Wilder could establish that the responding officers violated his constitutional rights, he must show that a municipal policy or custom was the moving force behind the violation.[74] The "policymaker" prong of *Monell* is satisfied here because former Chief Morgan was the final policymaker for LPD training, supervision, and procedures. The Lafayette Police Department operates under the authority of LCG. Thus, any alleged unconstitutional policy or practice would be directly attributable to LCG through Morgan's official policymaking authority. An official policy may exist in the form of "written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."[75] "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy."[76] Instead, Wilder must prove "that the policy itself violated federal law or authorized or directed the deprivation of federal rights."[77]

Wilder alleges that LCG's "use of force" policy is unconstitutional because it failed to include adequate an "de-escalation" policy. Wilder concedes that LCG had a de-escalation policy that "was practiced and taught during training under the term Verbal Judo, which uses verbal communication to prevent, de-escalate or end potential confrontations."[78] He also concedes that "Lafayette Police Department officers must complete an initial and then annual de-escalation training" and that "the training is comprised of eight hours of classroom and an additional eight hours of scenarios."[79] However, according to Wilder, "the de-escalation policy, practice, or custom

---

[74] *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 404 (1997)
[75] *Alvarez v. City of Brownsville*, 904 F.3d 382, 389-90 (5th Cir. 2018)
[76] *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).
[77] *Austin v. City of Pasadena, Texas*, 74 F.4th 312, 332–33 (5th Cir. 2023) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Forc*e, 379 F.3d 293, 309 (5th Cir. 2004)).
[78] ECF No. 35 at ¶ 39.
[79] *Id*.

that was in place for the Lafayette Police Department was inadequate and inadequately trained upon, promulgated, and enforced by [Defendants] and was a moving force and proximate cause of Mr. Wilder's constitutional violations and resulting injuries complained of herein."[80] He bases this on his allegation that the responding officers in this case failed "to even attempt to de-escalate the situation with Mr. Wilder before resorting to forcefully tackling him to the ground, kneeling on his neck, and arresting him …."[81] Wilder also argues that the policy is inadequate because it does not include "a written '*Require* De-escalation' policy as part of its 'use of force policy.'"[82] Finally, Wilder points to evidence that, after his encounter with the police, LCG adopted "a written de-escalation policy, which requires Lafayette Police officers to take action or communicate verbally or non-verbally during a potential force encounter."[83]

Wilder also alleges that, while LCG had a written "duty to intervene" policy, this policy "was inadequate because the policy fails include a police officer's duty to intervene and/or notify appropriate supervisory authority if the officer observes another officer engage in any unreasonable use of force against a citizen."[84] Wilder acknowledges that the Lafayette Police Department had a "*more adequate* (but still inadequate) 'duty to intervene' policy … tucked away in the middle of [its] 'use of force' policy." [85] Nevertheless, the department lacked an "adequate and distinct" policy given the events of Wilder's arrest.[86] Wilder also points to evidence that, as with the de-escalation policy, LCG revised its duty to intervene policy after the events at issue.[87]

---

[80] *Id*. at ¶ 40.
[81] *Id*. at ¶ 46.
[82] *Id*. at ¶ 39 (emphasis added).
[83] *Id*. at ¶ 45.
[84] *Id*. at ¶ 50.
[85] *Id*. (emphasis added).
[86] *Id*.
[87] *Id*. at ¶ 54.

"An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct."[88] Wilder's allegations and the summary judgment record do not show that LCG's use of force, de-escalation, or duty to intervene policies affirmatively allow or compel unconstitutional conduct. His claims are instead grounded on allegations that the policies are inadequate and omit guidelines and instructions required to prevent unconstitutional conduct. A municipality may be held liable for failing to adopt policies.[89] However, allegations that a facially innocuous policy is inadequate or omits "procedural safeguards to prevent constitutional violations," is subject to a deliberate indifference standard.[90] For the municipality to be held liable under this standard, the "omission must amount to an intentional choice, not merely an unintentionally negligent oversight."[91] "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[92] To prove deliberate indifference, a plaintiff must usually show "a pattern of similar violations."[93] "To show deliberate indifference based on a single incident, there must be evidence that shows that it should have been apparent or obvious to the policymaker that a constitutional violation was the 'highly predictable consequence' of the particular policy."[94]

The summary judgment record here does not create a triable issue on deliberate indifference. Wilder alleges a pattern of excessive force violations that he argues proves deliberate indifference. He alleges that between "2010 and 2019, statistics published by LPD show 1,172 use

[88] *Edwards v. City of Balch Springs, Texas*, 70 F.4th 302, 308–09 (5th Cir. 2023).
[89] *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989))
[90] *Edwards*, 70 F.4th at 308–09
[91] *Rhyne*, 973 F.2d at 392.
[92] *Id.*
[93] *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010).
[94] *Alvarez*, 904 F.3d at 391 (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003)).

of force reports submitted by LPD officers, equating to one approximately every three days."[95] He further alleges that "between 2010 and 2019, there were 107 civil lawsuits filed against LPD" that "contain repeated allegations the Lafayette Police Department officers used excessive force during arrests of citizens, used excessive deadly force against citizens, and that Lafayette Police Department officers failed to intervene to stop or prevent fellow officers from using excessive force on citizens when able to do so."[96] Wilder's Second Amended Complaint then summarizes twenty cases filed from 2012 through 2020 that include allegations of excessive force.[97]

A plaintiff may point to prior occurrences of constitutional violations to plead a *Monell* claim against a municipality. Those prior occurrences, however, must be not only similar to conduct at issue in the plaintiff's case but also persistent as opposed to sporadic or isolated.[98] This persistency requirement ensures that the alleged pattern of unconstitutional actions by municipal officers is based on conduct that has "occurred for so long and with such frequency that the course of conduct demonstrates the [municipality's] knowledge and acceptance of the disputed conduct."[99] The Fifth Circuit also requires a plaintiff to plead more than a list of past actions alleged to be unconstitutional; a plaintiff must place these past occurrences in context to support the inference that the municipality knew about and accepted a wide-spread course of unconstitutional conduct.[100] For example, in *Peterson v. City of Fort Worth, Tex.*,[101] the plaintiff identified 27 excessive force complaints of against the Fort Worth Police Department over approximately four years. The court held that these prior occurrences did not support a *Monell* claim because the plaintiff "failed to provide context" to those 27 excessive force complaints

[95] ECF No. 35 at ¶ 26.
[96] *Id.* at ¶ 37.
[97] *Id.* at ¶ 29.
[98] *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010).
[99] *Id.*
[100] *Peterson,* 588 F.3d at 851–52.
[101] *Id.*

sufficient to show that the complaints reflected municipal policy: "Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy."[102]

Here, Wilders' allegations do not show a widespread practice or pattern that rises to the level of municipal policy. Specifically, Wilders' allegations with respect to the 107 lawsuits filed against LPD from 2010 through 2019 do not describe the nature or circumstances of the conduct at issue in 87 of those 107 cases.[103] The 20 excessive force cases actually described in the Complaint were filed over a thirteen-year period—more than three times longer than four-year period and 27 complaints that the *Peterson* court found insufficient to establish a municipal policy.[104] Moreover, like the plaintiff in *Peterson*, Wilder does not place these seven excessive force complaints in context to show that they reflect a pattern that rises to the level of LCG policy.[105] For example, Wilder does not point to evidence placing these complaints in the context of total arrests, nor do they point to evidence showing comparisons to similar municipalities. Finally, 7 of the 20 cases summarized in the Second Amended Complaint involved events occurring *after* the October 24, 2019 events at issue in the present case and cannot serve as evidence of a persistent pattern at the time of Wilder's arrest.[106]

Nor does Wilder's allegation that 1,172 use-of-force reports were filed by LPD officers from 2010 through 2019 show such a pattern without additional context.[107] A use-of-force report

---

[102] *Id.* at 851 n.4.
[103] ECF No. 35 at ¶ 29.
[104] *Id.*
[105] *Peterson,* 588 F.3d at 851–52. The Complaint also alleges that "[a]t least ten more lawsuits have been filed in federal court alone detailing excessive use of force, improper training, improper hiring, and improper discipline against LPD." ECF No. 3 at ¶ 55. These allegations, however, omit the time frame of these ten lawsuits or any description of the nature and circumstances of the conduct challenged in those cases. Plaintiffs' opposition to the Motion for Summary Judgment does not address this omission.
[106] ECF No. 35 at ¶ 29.
[107] ECF No. 3 at ¶ 53.

does equate to evidence of an *excessive* use of force absent facts showing the nature of and context for the use of force. Wilder pleads no facts—nor points to any evidence in response to the Motion for Summary Judgment—showing that this number of use-of-force reports is so unusual or extreme that it supports an inference of a persistent pattern of *excessive* force violations. For example, Wilder does not place this statistic into the context by showing the total number of arrests, nor does he offer comparisons to other, similarly situated municipalities.[108]

In contrast, in *Flanagan v. City of Dallas*,[109] the court held that the plaintiff sufficiently pled a *Monell* claim based on a pattern of excessive force applied by members of the Dallas Police Department. There, the plaintiff pled a combination of statistics, past incidents, and statements by city officials.[110] The plaintiff's allegations included statistics comparing the City of Dallas to similarly situated municipalities as far as police misconduct, the number of grand juries convened and internal affair investigations conducted regarding police misconduct, and the number of shootings of unarmed individuals by Dallas police officers during the same year that the plaintiff was subjected to unreasonable force.[111] Unlike *Flanagan*, Wilder's allegations do not provide the context required to support a plausible *Monell* claim. Nor does their Opposition to the Motion for Summary Judgment overcome this pleading deficiency by pointing to evidence supporting their allegations of a pattern of excessive force by the LPD.

Absent evidence of "a pattern of similar violations," Wilder must rely on the "single incident" prong of deliberate indifference. Wilder points to evidence that LCG amended its "use of force" and "duty to intervene" policies to provide more guidance and instructions to officers on the when and how to escalate or de-escalate the use of force. He also argues that LCG's policies

[108] *Peterson,* 588 F.3d at 851 n. 2.
[109] 48 F.Supp. 3d 941, 953 (N.D. Tex. 2014).
[110] *Id.*
[111] *Id*. at 953.

give LPD's officers "complete discretion to decide what constitutes 'reasonable force' under the circumstances, as evidenced by the policy statement stating that 'officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.'"[112] Wilder alleges that this wide discretion and lack of guidance on the use of force resulted in an excessive use of force by Officers Smith and Mouton during his arrest. Defendants, however, point to evidence that LCG's use of force policy described "use of officer presences, officer dialog and verbal commands."[113] LCG also points to evidence that LPD officers were trained in "verbal judo" as a de-escalation technique. The summary judgment record also includes evidence that LCG maintained written use of force policies, arrest procedures, and officer conduct.[114] Defendants contend that while there was no independent "require de-escalation" policy, the summary judgment record reflects that de-escalation was a widespread, common, and well-settled practice at LPD.[115] Defendants argue that these policies were consistent with state law and policing standards at the time of Wilder's arrest.[116]

The summary judgment record does not create a triable issue on deliberate indifference under the "single incident" prong. The summary judgment record shows that LCG had a use of force policy that included training on "verbal judo," a form of de-escalation. The record also shows that LCG had a duty to intervene policy that Wilder concedes was "more adequate" but still inadequate. Wilder points to ways that LCG could have allegedly strengthened its policies—including pointing to changes that LCG made after Wilder's arrest—but does not show how the absence of these additional guidelines and instructions at the time of his arrest was the "moving

[112] ECF No. 35 at ¶ 61.
[113] ECF No. 77-2 at 7.
[114] *Id.* at 6-7.
[115] ECF No. 77-9, Exhibit F, LPD General Order 301.12.
[116] *Id.*

force" for the responding officers' alleged constitutional violations. In *Austin v. City of Pasadena, Texas*, the plaintiff similarly argued that the defendant municipality's use of force policy was inadequate and essentially "no policy at all."[117] The court rejected these allegations as grounds to impose liability on the municipality. According to the court, the policy "'may have been inadequate,' and while a jury might conclude that the City was negligent in not requiring [the plaintiffs'] specified actions, 'that, of course, is not enough under § 1983.'"[118] Instead, the plaintiff in *Austin* had the burden of showing that the inadequacies in the policies resulted from deliberate indifference, which he could not show.[119] Here, as in *Austin*, Wilder has not shown that LCG was deliberately indifferent in employing policies that did not include all of the guidance or instructions Wilder cites in his complaint. Nor has Wilder shown that LCG was deliberately indifferent merely because LPD's policies allow officers to exercise on-the-scene discretion and judgment in deciding when and how to use force against a detainee.[120]

Wilder further argues that, even if LCG's formal written policies do not support a *Monell* claim, LPD had an informal custom or practice of engaging in excessive force without requiring officers to de-escalate the use of force. Wilder supports his allegations with the statistical evidence discussed above in connection with Wilder's deliberate indifference allegations. For the same reasons that this evidence does not show deliberate indifference, it does not support a *Monell* claim based on a longstanding practice and custom.

---

[117] 74 F.4th 312, 332–33 (5th Cir. 2023).
[118] *Id.*
[119] *Id.*
[120] *Edwards v. City of Balch Springs, Texas*, 70 F.4th at 310-11 (rejecting argument that use of force policy was facially unconstitutional because it calls "for an officer to use the officer's own subjective beliefs in determining whether deadly force was justified.")

**3. Failure to Train.**

Wilder further alleges that LCG failed to adequately train the officers involved in his arrest and that there is a direct causal link between that inadequate training and the deprivation of his constitutional rights. "The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."[121] However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[122] "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." [123] A plaintiff asserting an inadequate training claim must "allege with specificity how a particular training program is defective."[124] Moreover, the "inadequacy of training must be closely related to the injury."[125] A municipality is liable for a failure to train municipal employees if "(1) the municipality's training procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the violations in question."[126]

Here, Wilder alleges that LCG failed to adequately train the responding officers on use of force, de-escalation techniques, intervention, and dealing with intoxicated detainees. Quoting LCG's discovery responses, Wilder alleges that "LPD does not have any *specific written* training materials regarding use of force practices." LCG responds that LPD exceeds the required POST-mandated training of 20 hours and "provides officers with at least 40 hours of yearly in-

---

[121] *Bryan County,* 219 F.3d at 457 (quoting *City of Canton v. Harris,* 489 U.S. 378, 390 (1989)).
[122] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).
[123] *City of Canton,* 489 U.S. at 390.
[124] *Brenoettsy*, 158 F.3d 908.
[125] *Pineda v. City of Houston*, 291 F.3d 325, 332 (5th Cir. 2002).
[126] *Ratliff v. Aransas Cty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020).

service/continuing education."[127] LCG also points to the unquoted portion of its discovery response as to LPD's training:

> Officers with LPD attend yearly various in-service training with the department which cover numerous topics *including use of force* (the use of force topic is rather broad and includes things such as defensive tactics, control holds, handcuffing procedures, officer survival and the like). Some of the in-service and refresher courses consist of classroom discussion/lectures, viewing of videos, and others including hand on physical practical exercises. Officers are likewise allowed to attend training seminars and programs put on by other agencies and companies, as well as various defensive tactics instruction, use of OC spray, use of tasers, use of less-than-lethal modalities, firearms instruction, etc.

LCG further points to the deposition testimony of the two arresting officers, Smith and Mouton. Both testified that LPD's in-service training extended to use of force, including training on detainees who actively or passively resist and training on reading body language to determine the appropriate use of force.[128]

The summary judgment record does not create a triable issue with respect to Wilder's claim that LCG was deliberately indifferent with respect to training. Wilder, as explained above, has not shown "a pattern of similar violations" that would have put LCG on notice that LPD's training programs were inadequate and that constitutional violations were a highly predictable consequence of the defects in the programs. Nor has Wilder created a triable issue of deliberate indifference based on the "single incident" prong. The evidence in the record shows that the responding officers received training in use of force and related topics, that they were POST certified, and that they received yearly in-service training. While the training did not include specific training labeled "de-escalation" training, the training covers de-escalation. Wilder concedes as much in his Second Amended Complaint:

> LCG and the Lafayette Police Department did not have a written "Require DeEscalation" policy as part of its "use of force policy." Instead, such de-escalation

---

[127] ECF No. 77-2, Def's. Memo. in Support of Motion for Summary Judgment at p. 5, footnote 9.
[128] ECF No. 77-7 at 39, 98, 100; ECF No. 77-10 at 60.

> policy was practiced and taught during training under the term Verbal Judo, which uses verbal communication to prevent, de-escalate or end potential confrontations. Lafayette Police Department officers must complete an initial and then annual de-escalation training. The training is comprised of eight hours of classroom and an additional eight hours of scenarios. This includes scenarios based on general contact, volatile subjects, mentally disturbed, emotionally disturbed person, and teaches techniques of subject determination, listening and communications. In addition, LPD utilizes these techniques during all other scenario based training.

Wilder's claim that LPD's training programs were inadequate appears to be based solely on the events of his take-down and arrest, and his allegation that the officer's actions on that day show that the training they received was inadequate. According to Wilder, based on the officer's actions, they "were *effectively* trained… to violate a suspect's constitutional rights by using immediate physical force."[129] The court in *Marshall v. Russell* rejected a similar argument that the officer in that case "failed to follow his training," and that this failure "suggests the County could re-emphasize certain training and place greater emphasis on de-escalation techniques."[130] According to the court, "[w]hile these opinions certainly demonstrate that HCSO's training could be improved, this fails to show Sgt. Russell was not trained, the training falls below what is required under state law, or that the training required under state law itself is deficient."[131] The *Marshall* court's reasoning is persuasive. Wilder's allegation that Mouton and Smith failed to follow their training does not support a failure-to-train *Monell* claim against LCG.

Finally, the record does reflect that LPD did not have specific training addressing the use of force against detainees who are intoxicated or otherwise impaired. However, LCG points to evidence that LPD's training on use of force included instruction on dealing with detainees who actively or passively resist and instruction on reading body language to determine the appropriate

[129] ECF No. 84 at p. 23 (emphasis added).
[130] 391 F. Supp. 3d 672, 694 (S.D. Tex. 2018).
[131] *Id.*

use of force.[132] In light of this training, Wilder cannot point to evidence that additional instruction targeting intoxicated detainees would have altered his encounter with the responding LPD officers, or that a constitutional violation was a highly predictable consequence of LPD's failure to provide specific training targeting intoxicated detainees.

In sum, Wilder has not created a triable issue on his failure to train claims against LCG. Those claims are dismissed.

### B. <u>Claims against Former Chief Morgan</u>.

Defendants also seek summary judgment on Wilder's claims against former Chief Morgan in his individual capacity.[133] Under § 1983, supervisory officials cannot be held liable under a theory of respondeat superior merely because they supervise employees alleged to have committed constitutional violations.[134] Instead, a plaintiff may establish liability if the defendant-employer was personally involved in a constitutional deprivation or if there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."[135] Accordingly, a plaintiff must prove that the official either affirmatively participated in acts causing a constitutional deprivation or implemented unconstitutional policies that causally led to the plaintiff's injury.[136]

Here, Wilder grounds his claims against Morgan on allegations that Morgan failed to adequately train and supervise his officers and that he was negligent in hiring and disciplining officers.[137] As with his *Monell* claims, these claims fail because Wilder cannot prove a violation of his constitutional rights. Even if he could, Wilder has not pointed to any evidence in the

---

[132] ECF No. 77-7 at 39, 98, 100; ECF No. 77-10 at 60.
[133] ECF No. 77-2.
[134] *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that vicarious liability is applicable to § 1983 suits and a plaintiff "must plead that each Government-official defendant, through his own individual actions, has violated the Constitution.").
[135] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).
[136] *Hauestein v. Hilton*, 716 F. App'x 359, 360 (5th Cir. 2018).
[137] ECF No. 1.

summary judgment record that Morgan was present or otherwise personally involved in the takedown maneuver that injured Wilder. Moreover, as explained above, Wilder has not created a triable issue on deliberate indifference with respect to LPD's training programs. With respect to LPD's policies, Wilder fails to identify a written LPD policy or widespread custom implemented by Morgan that caused the alleged constitutional deprivation. Nor has he created a triable issue on deliberate indifference for the same reasons discussed in connection with his *Monell* claims against LCG.

Wilder also alleges that Morgan was deliberately indifferent in supervising and hiring officers. With respect to supervision, Wilder does not point to evidence showing specific supervisory failures by Morgan involving Mouton's and Smith's actions during Wilder's arrest. Instead, Wilder points to Officer Mouton's disciplinary history. Specifically, the summary judgment record shows that Mouton got into a physical altercation with another officer and was terminated. The Civil Service Board subsequently ordered that he be re-instated. But, as LCG notes in its Reply, Morgan was not police chief at this time, so this evidence cannot support a "failure to supervise" claim against him. Wilder also questions the decision to hire Mouton given his personal and employment history. But he fails to point to evidence showing Morgan's role in that hiring or, more importantly, how that hiring decision amounted to deliberate indifference. In sum, the summary judgment record does not show any triable issues as to the claims against former Chief Morgan in his individual capacity.

### C. State Law Claims.

The Court now turns to Wilder's remaining state law claims asserted under Louisiana law. Defendants move for summary judgment on Wilder's state law claims of assault, battery, intentional misrepresentation, intentional infliction of emotional distress, negligent infliction of

emotional distress, negligent hiring, negligent retention, negligent supervision, abuse of process, and malfeasance in office.[138] An employer's liability for negligent hiring, training, and supervision is based on the employer's independent duty to exercise reasonable care.[139] Viewing the evidence in the light most favorable to Wilder, the Court finds that Wilder has failed to establish a genuine dispute of material fact sufficient to support the remaining state law claims.

**1. Assault and Battery.**

Louisiana law defines assault as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."[140] Battery, under Louisiana law is "the intentional use of force or violence upon the person of another." [141] An officer may use reasonable force "to effect the arrest and detention" and to "overcome any resistance or threatened resistance of a person being arrested or detained."[142]

The question, then, is whether the responding officers used reasonable force in their take-down of Wilder. "Excessive force transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages."[143] The considerable factors of an excessive force case include "(1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and

---

[138] ECF No. 77-2.
[139] *Gomez v. Galman*, 18 F.4th 769 (5th Cir. 2021).
[140] La. Rev. Stat. Ann. § 14:36
[141] La. Rev. Stat. Ann. § 14:33
[142] LA C. Cr. P. Art. 220
[143] *Penn v. St. Tammany Par. Sheriff's Office*, 843 So. 2d 1157, 1161 (La. App. 1 Cir. 2003) (citing *Ross v. Sheriff of Lafourche Par.*, 479 So. 2d 506, 511 (La. App. 1st Cir. 1985).

(7) the exigencies of the moment."[144] "Whether the force is used is reasonable depends upon the totality of the facts and circumstances in each case."[145]

As explained above, Wilder has not shown that Mouton's and Smith's actions amounted to unreasonable force. The video recordings of the arrest show that Wilder was not following the responding officers' commands and resisted turning over his cellphone and the officers' attempts to exercise control over him. As far as danger to the officers, while the cellphone could have been used as a weapon and Wilder was not cooperating with the officers, it is less clear based on the video whether Wilder posed a danger to the officers. However, the open-handed takedown maneuver used by the officers was a proportionate response to Wilder's actions, and a reasonable effort by the officers to regain control over Wilder. Unlike the cases cited by Wilder, the officers did not strike or tase Wilder, nor did they employ a maneuver designed to violently slam him to the ground. Once Wilder was handcuffed, the officers' use of force ceased and they rendered medical aid. In sum, there is no evidence from which a reasonable jury could conclude that the officers committed assault or battery under Louisiana law.

**2. Intentional and Negligent Infliction of Emotional Distress.**

Both intentional and negligent infliction of emotional distress are recognized in Louisiana Civil Code Article 2315.[146] Intentional Infliction of Emotional Distress requires a plaintiff to prove (1) the conduct was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.[147]

---

[144] *Id.*
[145] *Kyle v. New Orleans*, 353 So.2d 969, 972 (La. 1977).
[146] La. Civ. Code art. 2315.
[147] *White v. Monsanto Co.*, 585 So.2d 1205 (1991).

The action in question must rise to the level of "extreme or outrageous to a degree calculated to cause severe emotional distress to a person of ordinary sensibilities."[148]

While Louisiana does not generally recognize an independent tort of negligent infliction of emotional distress, extraordinary circumstances may permit a cause of action.[149] Here, the Court finds insufficient evidence to support the intentional infliction of emotional distress claim. Although Wilder disputes the reasonableness of the officers' actions, the record does not support the finding of outrageous conduct. The officers took reasonable steps to ensure both public and Wilder's safety by lowering him to the ground.[150] Further, the Wilder fails to identify any evidence that Defendants desired to inflict severe emotional distress. Because an OWI investigation is in the regular course of their duties, the officers did not know or were not substantially certain that their actions would cause distress.

Generally, Louisiana law does not recognize a cause of action for negligent infliction of emotional distress.[151] Only extraordinary circumstances may illicit a negligent infliction of emotional distress.[152] When special circumstances arise, a plaintiff seeking to sue for negligent infliction of emotional distress must prove 1) an independent, direct duty owed by the defendant to the plaintiff, 2) the duty afforded protection for risk and harm caused, 3) the duty was breached, and 4) mental anguish suffered by her was genuine and serious.[153]

Here, Wilder also failed to identify evidence that established a breach of a special duty in relation to the alleged negligent infliction of emotional distress. The Officers' actions stemmed from their investigation and subsequent detention of Wilder. When Wilder resisted, the officers

---

[148] *Id.*
[149] *Moresi v. Dept. of Wildlife and Fisheries*, 567 So.2d 1081, 1096 (La. 1990).
[150] ECF No. 77-10, Exhibit G, Smith Depo, pp. 6-7.
[151] *Id.*
[152] *Id.*
[153] *Bacas v. Falgoust*, 760 So.2d (La. App. 5th Cir. 2000).

applied appropriate force to bring him into compliance.[154] Accordingly, Defendants are entitled to summary judgment with respect to Wilder's intentional and negligent infliction of emotional distress.

**3. Negligent Hiring, Supervision, and Retention.**

Under Louisiana law, claims for negligent hiring, supervision, and retention require proof that the employer knew or should have known that the employee posed a risk of harm to others and failed to exercise reasonable care in hiring, training, supervising, or retaining the employee.[155] Determining whether an official is entitled to protection is governed by the test set forth in *Roberts*: "(1) whether a state law, regulation, or policy specifically prescribes the officer's course of action and (2) whether the challenged action is grounded in political, economic, or social policy."[156]

Louisiana law further provides discretionary immunity for governmental decisions based on policy.[157] Discretionary immunity provides that "[l]iability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties."[158] The Fifth Circuit defined the relationship between discretionary function and qualified immunity: "A public official performing a discretionary function is entitled to qualified immunity in a civil action for damages, provided his conduct does not 'violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.'"[159] The discretionary function test adopted in *Roberts* is used in

[154] ECF No. 77-4, Exhibit A, Attachment 1; La. Code Crim. Proc. Ann. Art. 220 ("The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained").
[155] La. Civ. Code art. 2315.
[156] *Roberts v. City of Shreveport*, 397 F.3d 287 (2005).
[157] La. Rev. Stat. 9:2798:1.
[158] La. Rev. Stat. § 9:2798.1(B).
[159] *Gentilello v. Rege*, 627 F.3d 540 (5th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

subsequent cases where it was determined that "hiring/retention policy was a discretionary act," and thus applications of the policy does not impute liability to the relevant department.[160] Discretionary immunity bars claims based on discretionary policy decisions.[161] Wilder has not identified evidence showing Defendants acting outside the scope of discretionary authority.

In the present case, Wilder alleges that Morgan and LCG were negligent in hiring Officer Mouton.[162] In this regard, Wilder points to Officer Mouton's prior conduct and personnel record, including past drug arrests and a school suspension as a teenager.[163] In addition, Wilder points to a previous interaction between Mouton and a fellow officer.[164] However, the entire summary judgment record reflects that Officer Mouton underwent LPD's hiring and screening process.[165] This process included application questions, a polygraph exam, and an in-person interview in front of a panel.[166] The record also demonstrates that Mouton maintained POST certification and received departmental training relating to arrests, officer conduct, and other officer procedures.[167] Although Wilder relies on Mouton's history, the record reflects that the prior incident did not involve allegations of excessive force against a civilian during an arrest or roadside detention.[168] Moreover, Mouton's termination was ultimately overturned through the civil service process.[169] In sum, Defendants are entitled to summary judgment on Wilder's state law claims for negligent hiring, supervision, and retention. Those claims are dismissed.

---

[160] *Roberts*, 397 F.3d 287; *Smith v. Lafayette Parish Sherrif's Dept.*, 874 So.2d 863 (La. App. 2 Cir. 2004).
[161] La. R.S. 9:2798.1.
[162] ECF No. 81-2, Plaintiff's Motion of Summary Judgment.
[163] *Id.*, p. 5.
[164] *Id.* at pp. 5-6.
[165] ECF No. 77-2.
[166] ECP No. 84, Reply Memo in support of Motion for Summary Judgment, at p. 9.
[167] *Id.* at 7-8.
[168] *Id.* at 8-10.
[169] *Id.* at 9.

**4. Malfeasance in Office and Abuse of Process.**

Malfeasance requires a public office to "intentionally, unlawfully, and knowingly refuse and fail to perform a duty and/or duties lawfully required of him as such officer."[170] Under Louisiana law, malfeasance "appears to be reserved for extremely egregious offenses, generally arising to the level of criminal conduct."[171] Here, Wilder provides no factual support for an egregious offense or that Morgan or LCG engaged in an intentional or knowing failure of their duties.

In addition, an abuse of process claim requires that a plaintiff prove the (1) existence of an ulterior purpose, and (2) the willful act in the use of process is not proper in regular prosecution of the proceeding.[172] There is also no evidence or factual basis supporting the claim that Morgan or LCG acted in a purposeful or improper manner. Accordingly, the Defendant's Motion for Summary Judgment with respect to Wilder's malfeasance and abuse of process is granted.

**5. Vicarious Liability**

Wilder claims that LCG is vicariously liable for the acts of the officers. Under Louisiana law, an employer may be held vicariously liable for a tortious act of an employee when an employee is "acting within the course and scope of employment."[173] Importantly, "the employer cannot be liable if the employee is not at fault."[174] Unlike claims under 42 U.S.C. § 1983, Louisiana law allows for municipalities to be subject to vicarious liability.[175]

There is no dispute that Officers Smith and Mouton were acting within the scope of their employment because they were responding to a vehicular accident while on duty. However, as

---

170 *State v. Dider*, 259 La. 967 (La. 1971).
171 *Jones v. Herlin*, No. 12-1978, 2013 WL 5270547, at *7 (W.D. La. Sept. 17, 2013).
172 *Panepinto v. Panepinto*, 384 So.3d 1089 (5th Cir. 2024) (citing *No Drama, LLC v. Caluda*, 117 So.3d 747 (5th Cir. 2015).
173 *Brasseaux v. Town of Mamou*, 752 So.2d 815, 821 (La. 2000).
174 *Jameson v. Montgomery*, 366 So.3d 1210 (La. 2023).
175 *Id.*

explained above, the Court has dismissed the remaining state law claims. Accordingly, Wilder cannot maintain a claim for vicarious liability against LCG.

## IV.
## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion for Summary Judgment [ECF No. 77]. All remaining federal and state claims against LCG and Scott Morgan are DISMISSED.

THUS DONE in Chambers on this 25th day of September, 2026.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE